In re SHEFFIELD STEEL CORPO-
RATION, a Delaware corporation,
Waddell's Rebar Fabricators, Inc., a
Missouri corporation, Wellington In-
dustries, Inc., a Delaware corpora-
tion, Debtors and Debtors in Posses-
sion.

Sheffield Steel Corporation, Plaintiff,

v.

HMK Enterprises, Inc., Steven
E. Karol, and Robert W.
Ackerman, Defendants.

Bankruptcy No. 01–05508–R.
Adversary No. 03–0134–R.

United States Bankruptcy Court,
N.D. Oklahoma.

Nov. 8, 2004.

Neal Tomlins, Ronald E. Goins, Tomlins & Goins, Tulsa, Oklahoma, for Plaintiff/Debtor.

Frederic Dorwart, Matthew J. Browne, Deirdre O. Dexter, Frederic Dorwart Lawyers, Tulsa, Oklahoma, J. Owen Todd, Howard M. Cooper, Todd & Weld LLP, Boston, Massachusetts, for Defendants.

## ORDER DENYING DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

DANA L. RASURE, Bankruptcy Judge.

This matter is before the Court on—

- Defendants' Motion for Partial Summary Judgmment [sic] (First Amended Adversary Complaint) (With Request for Oral Argument) (Adv.Doc. 41), filed by Defendants HMK Enterprises, Inc. ("HMK"), Steven E. Karol ("Karol") and Robert W. Ackerman ("Ackerman") (collectively the "Defendants") on January 23, 2004 (the "Motion");

- Defendants' Brief in Support of Defendants' Motion for Summary Judgmement [sic] (First Amended Adversary Complaint) (Adv.Doc. 42), filed on January 23, 2004 ("Defendants' Brief");

- Affidavit of Howard Stevenson (Adv. Doc. 43) filed by Defendants on January 23, 2004 ("Stevenson Affidavit");

- Affidavit of Robert W. Ackerman (Adv.Doc. 44) filed by Defendants on January 23, 2004 ("Ackerman Affidavit");

- Defendants' Appendix (Vol. I and II) filed on January 23, 2004;

- Plaintiff's Brief in Opposition to Defendants' Motion for Summary Judgment (Adv.Doc. 48), filed by Plaintiff and Debtor Sheffield Steel Corporation ("Sheffield") on February 24, 2004 ("Sheffield's Brief");

- Affidavit of Stephen R. Johnson (Adv.Doc. 49), filed February 24, 2004 ("Johnson Affidavit");

- Appendix (Adv.Doc. 50), filed by Sheffield on February 24, 2004; and

- Defendants' Reply Brief in Support of Defendants' Motion for Summary Judgmement [sic] (First Amended

Adversary Complaint) (Adv.Doc. 58), filed on March 15, 2004 ("Defendants' Reply Brief");

## I. Jurisdiction

The Court has jurisdiction of this "core" proceeding by virtue of 28 U.S.C. §§ 1334, 157(a), and 157(b)(2)(B), (C), (H), and (O); Miscellaneous Order No. 128 of the United States District Court for the Northern District of Oklahoma: Order of Referral of Bankruptcy Cases effective July 10, 1984, as amended; and ¶ 13.01(f) of the Second Amended and Restated Joint Plan of Reorganization, as confirmed by the Order Confirming Second Amended and Restated Joint Plan of Reorganization of Sheffield Steel Corporation, Waddell's Rebar Fabricators, Inc. and Wellington Industries, Inc. (Doc. 734 in Sheffield's bankruptcy case, Case No. 01–05508–R).

## II. Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine issue as to any material fact" and that it is "entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c), made applicable to this proceeding by Bankruptcy Rule 7056. "A fact is 'material' if under the substantive law it could have an effect on the outcome of the lawsuit." *Adams v. American Guarantee & Liability Ins. Co.,* 233 F.3d 1242, 1246 (10th Cir.2000), *citing EEOC v. Horizon/CMS Healthcare Corp.,* 220 F.3d 1184, 1190 (10th Cir.2000). "An issue is 'genuine' if 'a rational jur[or] could find in favor of the nonmoving party on the evidence presented.' " *Id., quoting Horizon,* 220 F.3d at 1190.

The moving party bears the initial burden of demonstrating an absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *See Spaulding v. United Transp. Union,* 279 F.3d 901, 904 (10th Cir.2002), *citing Celo-*

*tex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In attempting to meet that standard, a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out a lack of evidence for the other party on an essential element of that party's claim. *See Adams,* 233 F.3d at 1246, *citing Adler v. Wal–Mart Stores, Inc.,* 144 F.3d 664, 671 (10th Cir. 1998).

Once the movant has met its initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Spaulding,* 279 F.3d at 904, *citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548. The nonmoving party may not simply rest upon its pleadings to satisfy its burden. *Liberty Lobby,* 477 U.S. at 256, 106 S.Ct. 2505. Rather the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." *Mitchell v. City of Moore,* 218 F.3d 1190, 1197–98 (10th Cir. 2000), *quoting Adler,* 144 F.3d at 671. To accomplish this, the facts "must be identified by reference to an affidavit, a deposition transcript, or a specific exhibit incorporated therein." *Adams,* 233 F.3d at 1246.

"[A]t the summary judgment stage the judge's function is not ... to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Liberty Lobby,* 477 U.S. at 249, 106 S.Ct. 2505. Reasonable inferences that may be made from the proffered evidentiary record should be

drawn in favor of the non-moving party. *See Adams,* 233 F.3d at 1246. However, "[i]f the [non-moving party's] evidence is merely colorable or is not significantly probative, summary judgment may be granted." *Liberty Lobby,* 477 U.S. at 249–50, 106 S.Ct. 2505 (citations omitted). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita,* 475 U.S. at 587, 106 S.Ct. 1348. Conversely, even where a movant's facts are undisputed, if two reasonable factfinders could reach different conclusions or "ultimate inferences" from the undisputed facts, summary judgment is not warranted. *See Luckett v. Bethlehem Steel Corp.,* 618 F.2d 1373, 1382 (10th Cir.1980).

### III. Contentions of the parties

Sheffield filed its nine count First Amended Adversary Complaint (the "Complaint") on December 5, 2003 (Adv.Doc. 27). The Complaint challenges transfers made by Sheffield to Karol, Ackerman and HMK and the conduct of Karol and Ackerman, as directors of Sheffield, in authorizing the transfers. The transfers fall into three categories: dividends, stock repurchases, and a loan.[1]

Sheffield alleges (1) that dividends paid to Karol, Ackerman and HMK in 1997 and 1999 were unlawful under the Delaware statute that prohibits a corporation from paying dividends except from its surplus and (2) that the dividends were fraudulent transfers that are avoidable under the Oklahoma Uniform Fraudulent Transfer Act. Sheffield seeks to recover the dividends directly from Karol, Ackerman and HMK on the grounds that they are the immediate transferees of fraudulent transfers and/or recipients of unlawful dividends. In the alternative, Sheffield seeks damages from Karol and Ackerman in the amount of the dividends under the Delaware statute that imposes liability on directors who authorize the payment of unlawful dividends. Sheffield also seeks to recover the amount of dividends from Karol and Ackerman on the ground that they breached fiduciary duties that they owed as directors to the corporation by authorizing the dividends.

With respect to the stock repurchase transfers, Sheffield alleges that it is entitled to avoid and recover, under Oklahoma fraudulent transfer law, certain payments made by Sheffield to Ackerman for its repurchase of common stock from Ackerman in 2000.

Defendants contend they are entitled to summary judgment on Count I (Avoidance and Recovery of Fraudulent Transfer [of dividends]—Section 117), Count II (Avoidance and Recovery of Fraudulent Transfer [of dividends]—Section 116), Count VII (Breach of Fiduciary Duty by Directors [for authorizing payment of dividends]), Count VIII (Avoidance and Recovery of Fraudulent Transfers [stock repurchase]—Section 117—Ackerman) and Count IX (Avoidance and Recovery of Fraudulent Transfer [stock repurchase]—Section 116—Ackerman) of the Complaint because the undisputed facts show that "Sheffield was not insolvent at the time of or as a result of any of the challenged transfers." Defendants' Brief at 1. Sheffield argues that contrary to Defendants' proffered evidence of solvency, Sheffield's audited financial statements clearly show that it had a negative net worth as a result of paying the 1997 dividends and at the time of payment of the 1999 dividends and the 2000 stock repurchases, and therefore a

---

1. Count VI alleges that HMK has failed to repay a $500,000 loan to Sheffield. HMK

does not seek summary judgment on this Count.

genuine issue of material fact exists that precludes summary judgment in favor of the Defendants. Sheffield's Brief at 3–4. Defendants also assert that Sheffield is not entitled to maintain an avoidance action because recovery of the transfers would not benefit the estate as required by Section 550(a) of the Bankruptcy Code. Defendants' Brief at 21.

Defendants also argue that they are entitled to prevail as a matter of law on Count III (Improper Dividend—Directors), Count IV (Improper Dividend—Shareholders) and Count VII (Breach of Fiduciary Duty by Directors [for authorizing payment of dividends]) of the Complaint, contending that the affidavits and exhibits tendered by Defendants demonstrate that it is undisputed that "[t]he Directors determined that adequate capital existed to pay the 1997 and 1999 Dividends and in so doing, were entitled to and did properly rely on reports and information submitted to them; the dividends were, therefore, proper under Delaware law and the Defendants are fully protected from liability" under a safe harbor provision of Delaware law. Defendants' Brief at 1. Sheffield argues that Defendants' proffered evidence fails to establish that Defendants are entitled to the protection of the safe harbor provision. Sheffield's Brief at 4.

Defendants also urge that because Sheffield's current shareholders are former bondholders who "expressly approved the 1997 and 1999 Dividends, Sheffield is estopped from avoiding and recovering the dividends" under Counts I, II, III, IV and VII. Defendants' Brief at 2. Sheffield contends that equitable estoppel is not a recognized defense to a fraudulent transfer claim. Sheffield's Brief at 4.

Finally, Ackerman contends that it cannot be disputed that he "gave reasonably equivalent value for his put rights and for the amounts transferred to him when the Company repurchased his option shares pursuant to its repurchase obligations" and therefore he is entitled to summary judgment on Counts VIII and IX. Defendants' Brief at 2. Sheffield argues that "Ackerman fails to provide evidence of the fair market value of the consideration he provided to Sheffield." Sheffield Brief at 4.

## IV. Evidentiary matters and disputed material facts

### A. Relevance and hearsay

#### 1. Statements of "adequate value"

■■■ Sheffield objects to Defendants' conclusory statements that Sheffield had "sufficient value" or "adequate value" to justify the transfers. *See* Defendants' Statements of Undisputed Facts, ¶¶ 8, 16, 23, 26, and 28. "[C]onclusory allegations without specific supporting facts have no probative value." *Nichols v. Hurley,* 921 F.2d 1101, 1113 (10th Cir.1990), *quoting Evers v. General Motors Corp.,* 770 F.2d 984, 986 (11th Cir.1985). In addition, "sufficient value" and "adequate value" are not concepts with any legal significance in determining solvency under the Oklahoma Uniform Fraudulent Transfer Act or surplus under the Delaware surplus law, and therefore the Court will sustain Sheffield's relevance objections as to these statements and exclude such statements from the record on summary judgment.

#### 2. Statements concerning improvement in Sheffield's production and operational performance

Through the affidavits of Ackerman and Stevenson, Defendants provide a narrative of Defendants' opinion as to the progress of Sheffield's performance and production, as well as Ackerman's contributions to Sheffield. Sheffield objects to the relevance of such statements because they do

not prove that at any relevant time Sheffield was solvent or had surplus sufficient to permit the payment of lawful dividends. To the extent that Defendants offer these statements for those reasons, the Court agrees. Thus, for the purpose of analyzing Sheffield's Section 117 fraudulent transfer claims and the illegal dividend claims, the Court finds the following statements regarding performance to be immaterial or irrelevant: Defendants Brief, Statement of Undisputed Facts, ¶¶ 9, 13, 14, 15, 16, 21, 24, 25, 27, 31, 40, and 41–48.

Some of these statements may be relevant, however, for the purpose of establishing that the transfers were not fraudulent under Section 116(A)(2), inasmuch as earnings, cash flow and liquidity are factors in determining whether Sheffield had "unreasonably small remaining assets" after the transfers and whether the transfers resulted in an inability to pay debts as they became due.

### 3. The Arthur Andersen valuation

■ Sheffield also objects to paragraph 30 of Defendants' Statement of Undisputed Facts on the basis of hearsay and relevance. Paragraph 30 states: "At around this same time, an Arthur Andersen valuation reported that Sheffield's equity was worth more than $38 million." The Arthur Andersen report purports to establish a value of HMK's 91% interest in Sheffield as of December 31, 1999. Defendants' Exhibit 26. The report is clearly an out of court statement that is not an admission by Sheffield. Defendants contend that the valuation is not being provided for its truth (i.e., that Sheffield's equity exceeded $38 million), but rather to establish the state of mind of the Board members because the valuation is "business information available to the Board, which the Board considered in making the decisions now challenged by Sheffield." Defendants' Reply at 13. The Court must assume that the report purporting to value HMK's stock as of December 31, 1999, was prepared after December 31, 1999, and therefore after the payment of all dividends. Moreover, the portion of the report furnished to the Court does not indicate when the report was drafted or issued or provided to the Board, if at all, so there is no basis upon which the Court can determine its nexus, if any, to the Board's approval of the stock repurchases in 2000. Thus, Defendants fail to establish that the Arthur Andersen valuation, as offered, is relevant to the Board's knowledge or state of mind in authorizing the challenged transfers. Therefore paragraph 30 and Defendants' Exhibit 26 will not be admitted in connection with Defendants' Motion.

### 4. Hearsay

■ Sheffield also objects to the statements contained in paragraphs 11 and 17 as inadmissible hearsay. To the extent that Ackerman and Stevenson purport to speak for other Board members, such statements constitute inadmissible hearsay. See Adams v. American Guarantee & Liability Ins. Co., 233 F.3d 1242, 1246 (10th Cir.2000) ("a third party's description of a witness' supposed testimony is 'not suitable grist for the summary judgment mill'" (internal quotation and citation omitted)).

### 5. Rule 56(f) objection

■ Invoking Rule 56(f) of the Federal Rules of Civil Procedure (made applicable to adversary proceedings by Bankruptcy Rule 7056), Sheffield contends that "the Court must decline to enter judgment based upon the allegations of paragraph 11 until appropriate discovery may be conducted by Sheffield." Sheffield Brief at 7, ¶ 11. Defendants argue that Sheffield is not entitled to the invoke Rule 56(f) because it has not submitted an affidavit

explaining why facts to oppose summary judgment cannot be presented at this time. Rule 56(f) provides—

> Should it appear from the affidavits of the party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

Fed.R.Civ.P. 56(f). A request to deny or defer consideration of a summary judgment motion based upon a genuine unavailability of opposing affidavits or evidence "should be liberally treated," but must be accompanied by an affidavit stating the reason why evidence of facts essential to rebut the movant's statement of facts are unavailable, what steps have been taken to obtain the evidence and how much time is necessary to remedy the deficiency. *Committee for the First Amendment v. Campbell,* 962 F.2d 1517, 1522 (10th Cir. 1992). "[C]ounsel's unverified assertion in a memorandum opposing summary judgment does not comply with Rule 56(f) and results in a waiver." *Id.* (citation omitted). Sheffield has not requested additional time to obtain opposing affidavits or submitted an affidavit in support of such a request. Thus, to the extent that the statements Sheffield has not opposed with evidence due to lack of discovery are factual, material, supported by admissible evidence and otherwise undisputed, the Court will consider such statements undisputed for the purposes of considering Defendants' summary judgment motion.

## V. Undisputed material facts

The record supports the following undisputed material facts and reasonable inferences favorable to the non-movants from such undisputed facts.

Sheffield is a steel manufacturing company with its primary manufacturing facility in Sand Springs, Oklahoma. Defendants' Brief, Statement of Undisputed Facts, ¶ 1. On December 7, 2001, Sheffield filed a voluntary petition under Chapter 11 of the Bankruptcy Code (the "Petition Date"). Defendants' Brief, Statement of Undisputed Facts, ¶ 4. Ackerman was Chief Executive Officer of Sheffield from June 15, 1992 through May 30, 2000, and was a member of Sheffield's Board of Directors (the "Board") and a shareholder. Karol is the former Chairman of the Board and a former shareholder. HMK is a private holding company that held approximately 96 percent of Sheffield's stock on the Petition Date. Defendants' Brief, Statement of Undisputed Facts, ¶ 2; Defendants' Exhibit 14 at 35, 39. Karol and his sister, Jane Karol, each own 50% of the issued and outstanding shares of HMK voting stock. Defendants' Exhibit 14 at 39–40 n.(c), (d) and (e). In 1997, Sheffield's six member Board consisted of Ackerman, Karol, Dale Okonow (who was also Vice President and Secretary of Sheffield), Jane Karol, and outside directors Howard Stevenson and John Lefler. Defendants' Brief, Statement of Undisputed Facts, ¶ 3; Defendants' Exhibit 14 at 35. Mr. Stevenson is a prominent member of the faculty of the Harvard Business School and had thirty years of business experience prior to joining the Board. *Id.* Mr. Lefler held the position of President and CEO of Gulf State Steel and had been a senior executive at U.S. Steel. *Id.* In 1998, Robert Schaal replaced Mr. Lefler as an outside director of Sheffield. *Id.* At all times relevant to this dispute, Stephen R. Johnson ("Johnson") was the Chief Financial Officer of Sheffield. Defendants' Brief, Statement of Undisputed Facts, ¶ 5.

When Ackerman was retained by Sheffield as Chief Executive Officer in 1992,

the company was in violation of its loan covenants and was experiencing organizational and operating issues. Defendants' Brief, Statement of Undisputed Facts, ¶ 6. Thereafter, the Board and shareholders committed to undertake and financially support efforts pursuant to a long term strategy aimed at building value and moving the company to the top of its industry. Defendants' Brief, Statement of Undisputed Facts, ¶ 6. In 1993, the company began constructing and installing a new rolling mill at its Sands Springs location. The company issued a $75 million bond offering from which it paid off approximately $55 million in debt and applied the remainder to constructing the new mill. Defendants' Brief, Statement of Undisputed Facts, ¶ 7. The mill construction was completed in 1997. Defendants' Brief, Statement of Undisputed Facts, ¶ 9. As of 1997, Ackerman and Mr. Stevenson believed that performance had improved and that the company's strategic plan was "well executed and was beginning to bear fruit." Defendants' Brief, Statement of Undisputed Facts, ¶ 9 (not controverted by admissible evidence). At that point, the Board discussed a $110 million bond offering (the "Offering"), the proceeds of which would be used to pay a $10 million dividend to shareholders,

among other things. Defendants' Brief, Statement of Undisputed Facts, ¶ 10.

The Board met on September 17, 1997, to consider the Offering. Defendants' Brief, Statement of Undisputed Facts, ¶ 11. According to two members of the Board, Ackerman and Mr. Stevenson, who cannot speak for the entire board, the Board discussed the propriety of the $10 million dividend at that meeting, considered financial documentation, and determined that the company was financially secure and had sufficient "value" to declare a dividend. At the meeting, Ackerman and Stevenson, at least, considered that pre-tax profits exceeded Sheffield's "plan" by more than $700,000 for the first quarter of the fiscal year 1998 and considered other "favorable operational developments." Defendants' Brief, Statement of Undisputed Facts, ¶ 12. They also considered that EBITDA was "above plan" and relied upon projections to conclude that EBITDA would eventually exceed $30 million.[2] Defendants' Brief, Statement of Undisputed Facts, ¶ 13. Ackerman and Stevenson also considered that Sheffield "had good availability under its bank credit line and [that] the Offering would bring more cash into the Company" and were of the

2. Although Defendants contend in paragraph 13 that "[f]inancial reports showed that the Company's EBITDA was ... steadily rising," the exhibits submitted do not support that statement. The financial reports show actual EBITDA fluctuating during the short window of time (May 1997 through August 1997) considered by Ackerman and Stevenson. Defendants' Exhibit 5.

In addition, according to the financial reports, the projection upon which Ackerman and Stevenson relied in citing a $30 million EBITDA indicated that Sheffield would not realize that figure until fiscal year 2001. In fact, the same financial report indicated FY 1997 "Net Worth–Actual" of $2.156 million, and a projected net worth in FY 1998 of <$14,957,000>. Other "values" indicated in that financial report include a "private value"

(calculated as three times EBITDA less liabilities) of $<$85,494,000> in 1997 and <$92,­552,000> in 1998, and a "public value" (calculated as six times EBITDA less liabilities) of <$36,570,000> in 1997 and <$28,916,000> in 1998. Defendants' Exhibit 11 at SH 00614.

Defendants also claim in paragraph 13 that "Sheffield's trailing 12–month EBITDA was approximately $20 million and its trailing 12–month operating income was approximately $12 million," relying upon Ackerman Aff. ¶ 25 and Defendants' Exhibit 5, but the Court could not locate any "trailing 12–month" EBITDA or income in Defendants' Exhibit 5 to support that statement because the exhibit contained only four months of actual figures and eight months of projections.

opinion "that the Company was in compliance with all of its bank covenants ... and would remain in compliance if it paid the dividend." Defendants' Brief, Statement of Undisputed Facts, ¶ 14. Ackerman and Stevenson also reviewed reports comparing Sheffield to its competitors.[3] Defendants' Brief, Statement of Undisputed Facts, ¶ 15.

Sheffield's representative, Stephen Johnson, who was Chief Financial Officer at the time, did not attend the September 17, 1997, Board meeting, and was not asked by the Board to prepare, and did not prepare, any valuation of Sheffield's assets or a calculation of "surplus" as defined by Delaware law prior to or at the time of the payment of the $10 million dividend. Sheffield's Brief, Additional Facts, ¶ 50, 57; Defendants' Reply at 4, n. 11.

It is undisputed, however, that Sheffield's audited financial statements for the fiscal year ending April 30, 1997, stated a net loss of $3,509,000. Sheffield's Brief, Additional Facts, ¶ 49; Defendants' Reply Brief at 4, n. 11. The balance sheet attached to Sheffield's Form 10–Q for the quarterly period ended October 31, 1997, indicated assets of $132,788,000 and liabilities of $129,089,000 and a quarterly net income of $812,000. Sheffield's Exhibit 1. The Form 10–Q was signed by Ackerman and Johnson on December 12, 1997. *Id.* at 15.

On November 26, 1997, an Offering Memorandum was issued in which Sheffield announced its offering of 11½ % First Mortgage Notes (the "Notes") in the aggregate principal amount of $110 million. Defendants' Brief, Statement of Undisputed Facts, ¶ 19; Exhibit 14. The Offering Memorandum disclosed the proposed use of the proceeds of the Offering as follows:

The proceeds from the Offering are estimated to be approximately $106,000,000, after deduction of Initial Purchaser's discount and estimated expenses of the Offering. The net proceeds of the Offering will be applied as follows: (i) $79.5 million to redeem, at a redemption price of 106%, the 2001 Notes; (ii) $14.5 million to repay amounts under the Company's credit facilities which currently bear interest at a rate of prime plus 0.50% (or 9% as of December 1, 1997); (iii) $10 million to pay dividends to the Company's stockholders; and (iv) the remainder, if any, for general corporate purposes, including on going capital expenditures.

Defendants' Exhibit 14 at 13. Also included in the Offering Memorandum were statements regarding Sheffield's past financial performance, including reports of net losses in fiscal 1993, 1994, 1996 and 1997. *Id.* at 9, 15. The Memorandum also compared the pre-Offering capitalization of Sheffield (as of July 31, 1997) to the capitalization as if the Offering closed and the $10 million dividend was paid. *Id.* at 14. As a result of the Offering and payment of dividends, Sheffield anticipated an increase in long term debt from $94,490,000 to $114,637,000, a decrease in retained earnings from $1,283,000 to <$16,965,000> and a decrease in stockholders' equity from $3,853,000 to <$14,395,000>. *Id.*

The Offering Memorandum provided that Sheffield promised to restrict payment of dividends and repurchases or redemption of stock or warrants under a strict financial formula based upon the "internal quarterly financial statements," but—

> [n]otwithstanding the foregoing, the provisions [limiting declaration of dividends and redemption of stock] ... do

---

3. Although Defendants contend that Sheffield's performance compared favorably to its competitors, the exhibit offered to support that statement is inconclusive.

not prohibit: (1) the payment of any dividend or redemption payment within 60 days after the date of declaration of such dividend if the dividend or redemption payment, as the case may be, would have been permitted on the date of declaration, ... (4) if no Default or Event of Default shall have occurred and be continuing, pursuant to and in accordance with the Stock Option Plan, the purchase of capital stock or options from members of management or directors of the Company upon the terms set forth in the Stock Option Plan for consideration consisting of cash and/or Subordinated Management Notes; (5) the making of Restricted Payments in an aggregate amount not to exceed $2.5 million, (6) the payment of a dividend as described in this Offering Memorandum under "Use of Proceeds" within 90 days of the Issue Date in an aggregate amount not to exceed $10 million....

Defendants' Exhibit 14 at 48–49. The Trust Indenture dated December 1, 1997 also contained the same restrictions and exceptions as did a Prospectus filed with the Securities and Exchange Commission in January 1998 in connection with a proposed exchange of soon to be issued Series B Notes for the Series A Notes issued in connection with the Offering. Defendants' Exhibit 18 at 45–46 and Defendants' Exhibit 19 at 63 (the "Prospectus").

On or about November 12, 1997, Sheffield issued a press release to announce the Offering and the intended use of proceeds, including payment of "approximately $10 million in dividends to holders of [Sheffield's] Common Stock as of a record date to be determined on or after the closing date of the proposed offering." Defendants' Exhibit 15. In an internal Bankers Trust memo dated November 12, 1997, from certain Bankers Trust employees to its "High Yield Sales & Trading"

employees, the proposed use of proceeds of the Offering was described as follows—

The additional use of proceeds include a $16.5 million repayment of revolver borrowings and a $10.0 million dividend to the Company's shareholders. HMK Enterprises, an affiliate of Watermill Ventures, owns approximately 92.5% of the outstanding stock of Sheffield. HMK has owned Sheffield since 1981, and this dividend represents the first significant liquidity event for HMK since 1989 when it received a $10.0 million dividend. The remaining 7.5% of the Company's stock is held by bondholders who will be entitled to receive their prorata share of the dividend.

Defendants' Exhibit 16. Standard and Poors gave the Offering a B minus rating, indicating that "financial flexibility remains extremely limited, given the company's very aggressive capitalization (particularly in light of a planned $10 million dividend) and burdensome interest expense." Exhibit B to Defendants' Exhibit 16.

On November 26, 1997, Sheffield issued another press release announcing that "its Board of Directors has voted to pay the Company's stockholders a special cash dividend of $10 million. The dividend will be payable on December 8, 1997." Defendants' Exhibit 17.

On December 5, 1997, in connection with the Offering, Sheffield's regular outside counsel, Mintz, Levin, Cohn, Ferris, Glovesky and Popeo, P.C. ("Mintz") issued an opinion letter (the "Mintz Opinion") addressed to BT Alex. Brown Incorporated, the initial purchaser of the Notes to be issued under an Indenture between Sheffield and State Street Bank, Indenture Trustee, pursuant to the Offering. Defendants' Brief, Statement of Undisputed Facts, ¶ 18, Defendants' Exhibit 13. In forming its opinion, Mintz relied upon "representations and warranties as to mat-

ters of fact contained in the Transaction Documents, certificates of officers of the Company and of public officials and certificates delivered to [Alex. Brown] in connection with the Transaction Documents." Defendants' Exhibit 13 at 1. Additionally, Mintz stated that in forming its opinion it "ha[d] not undertaken any independent investigation, including, without limitation, any investigation of corporate, court or other documents or records, to determine the existence or absence of any such facts or other information, and no inference to our knowledge of the existence or absence of any facts or other information should be drawn from the fact of our representation of [Sheffield]." *Id.* at 1–2. Mintz also "assumed that (a) the proceeds of the issuance and sale of the Notes have on this date been applied as described under the heading 'Use of Proceeds' in the Final Memorandum...." *Id.* at 2. Subject to such qualifications, Mintz opined, among other things, that Sheffield was duly incorporated and was in good standing; that the Final Memorandum correctly set forth the status of outstanding and authorized capital stock of Sheffield; that except as specifically stated therein, such stock was owned free and clear and without restrictions on transferability; that there existed certain outstanding warrants; that Sheffield had the "requisite corporate power and authority to execute and deliver" the Transaction Documents; that the Notes were properly authorized and executed in compliance with the agreements of the parties and were valid and enforceable against Sheffield; that the Indenture was validly authorized, executed and delivered and in compliance with the Trust Indenture Act, and was valid and enforceable against Sheffield; that Sheffield had "requisite corporate power and authority to execute and deliver" a registration rights

agreement and security documents and that such agreements were valid and enforceable against Sheffield; that to [Mintz's] knowledge, there were no legal proceedings threatened or pending that challenged the issuance of the Notes or the consummation of the transactions contemplated by the proposed "Use of Proceeds;" and that—

> The issue and sale of the Notes by [Sheffield] and the compliance by [Sheffield] with all of the provisions of the Agreement, the Indenture, the Security Documents and the Notes and the consummation of the transactions contemplated thereby;
>
> > (ii) will not result in any violation of (A) the provisions of the charter or by-laws of [Sheffield] ... or (B) any statute, order, rule or regulation generally applicable to transactions of the type contemplated by the Agreement or to financings generally of any court or governmental agency or body having jurisdiction over [Sheffield]....

*Id.* at 3–5. Mintz disclaimed any opinion "on the financial statements, schedules, pro forma information, financial data or other financial and statistical information included in the Final Memorandum." *Id.* at 6. Further qualifying its opinion, Mintz stated—

> We express no opinion as to any matter other than as expressly set forth above, and no other opinion is intended to be implied nor may be inferred herefrom ... This opinion is rendered solely for [BT Alex.Brown's] benefit and may not be relied upon by any other person without our written consent, except by State Street Bank and Trust Company in its capacity as Trustee, which may rely on this opinion as if addressed to it.

*Id.* at 7.[4]

On December 8, 1997, while Karol and Ackerman were directors, Sheffield paid HMK a dividend in the amount of $8,995,544.00. Complaint, ¶ 10. Defendants' Answer to First Amended Adversary Complaint and Counterclaim ("Answer") (Adv.Doc. 62), ¶ 10. On January 2, 1998, while Karol and Ackerman were directors, Sheffield paid a dividend of $90,113.00 to Ackerman and a dividend of $30,096.00 to Karol. *Id.* In authorizing the dividends, Ackerman contends he relied upon financial reports prepared by Johnson, particularly the reports which showed that the first fiscal *quarter* of 1998 (May 1997 through July 1997) had exceeded Sheffield's "plan" or budget and that the "Company's EBITDA" [earnings before in-terest, taxes, depreciation amortization and, in the case of Sheffield, accrual of post-retirement benefit expenses, net of cash paid][5] was "significantly over plan," as well as projections, a liquidity analysis (*e.g.*, the availability of a line of credit), competitor analysis charts, operations reports, comparable sales reports, and a valuation analysis prepared by BT Alex. Brown for the purpose of soliciting investment banking business, *i.e.*, the right to offer and sell Sheffield.[6] Ackerman Affidavit at 9–10. Ackerman also contends that he relied on the fact that all Sheffield's financial information, including its negative book value, had been disclosed to the market in both authorizing the dividends and accepting the dividends. Defendants' Brief, Statement of Undisputed Facts, ¶ 20–22.[7]

4. The Court finds that the Mintz Opinion has scant evidentiary value in connection with the propriety of the declaration of the $10 million dividend or whether the payment of dividends might constitute fraudulent transfers. The Mintz Opinion expressly precludes reliance by the Board, and it clearly was not issued for the purpose of giving the Board advice concerning the legality of the dividend under the "surplus" statute or the potential for avoidance of the payment of dividends under fraudulent transfer theories. Rather, the opinion was written solely for the benefit of BT Alex. Brown, the initial purchaser of the Notes, and the Indenture Trustee, neither of whom would be affected if the proposed dividend was subject to recovery by Sheffield. In fact, recovery of the dividend would arguably be beneficial to any purchaser of the Notes.

In addition, Mintz disclaims any opinion as to the accuracy of any financial information provided to BT Alex. Brown and the Indenture Trustee in the Final Memorandum and indicates that it did no independent research regarding financial matters. The Mintz Opinion does not address the solvency of Sheffield, the existence of surplus from which to pay dividends, or whether the payment of dividends would constitute fraudulent transfers. Moreover, Defendants' proffered evidence does not establish, or even suggest, that the Board consulted with Mintz, or any attorneys, in connection with the legality of declaring the dividend or in connection with the potential for avoidance of the payment of the dividend, and the Court must reasonably infer that the Board *did not* seek Mintz's advice on those matters. Additionally, the Board could not have relied on the Mintz Opinion dated December 5, 1997, in declaring the dividend because it voted on the dividend on or before November 26, 1997. *See* Defendants' Exhibit 17.

5. See Sheffield Exhibit 3, Form 10–K for fiscal year ended April 30, 1998, at Exhibit 13.

6. BT Alex. Brown's "preliminary valuation" was dated January 27, 1998—*after* the $10 million dividend had been declared and paid. In addition, the proposed sales price was contingent upon "convincing potential buyers of Sheffield's EBITDA improvement opportunities." Defendants' Exhibit 12. Thus, BT Alex. Brown's "valuation" has no evidentiary value in connection with the knowledge or the state of mind of Karol and Ackerman when they declared and authorized Sheffield to pay the $10 million dividend.

7. Ackerman contends that he relied on the "Bondholder's [sic] approval of the dividends" in approving and accepting the dividends. Defendants' Brief, Statement of Undisputed Facts, ¶ 22, The undisputed facts do not establish that the bondholders *approved* the dividends, however.

Sheffield's Chief Financial Officer, Johnson, was never asked to prepare, and did not prepare, any valuation of Sheffield's assets in connection with the payment of these dividends, and Johnson is unaware of any valuation of Sheffield's assets by the Board at the time of payment. Sheffield's Brief, Additional Facts, ¶ 50. Johnson was not requested to prepare a calculation of "surplus" as defined by Delaware law nor is he aware that the Board ever made a calculation of "surplus" at any time in connection with the dividends. *Id.*

In mid-January 1998, the Prospectus was issued in connection with the exchange of Series A Notes for Series B Notes. At that point, the Offering had been consummated and the $10 million dividend had already been paid, but the $2.5 million dividend had not. As in the Offering Memorandum, the Prospectus disclosed Sheffield's pledge not to engage in certain transactions or make certain payments, but excepted from that pledge the right to make an unspecified $2.5 million payment. Defendants' Exhibit 19. Neither the Prospectus nor the Offering Memorandum suggested that the dividends would be paid notwithstanding the solvency of Sheffield or the status of its "surplus."

The balance sheet (unaudited) attached to Sheffield's Form 10–Q for the quarterly period ended January 30, 1998, stated assets of $139,026,000 and liabilities of $153,993,000 and a quarterly net loss of $8,647,000 (which included an extraordinary loss of $8,000,000 associated with the cost of the Offering and retirement of debt). Sheffield's Exhibit 2 at 3, 4 and 7. The Form 10–Q was signed by Ackerman and Johnson on March 12, 1998. *Id.* at 15.

Sheffield's audited financial statements for the fiscal year ending April 30, 1998, attached to Sheffield's Form 10–K filing, stated assets of $143,618,000 and liabilities of $157,744,000, and a net loss of $6,226,000 (including the extraordinary loss in the amount of $8,000,000 associated with the cost of the Offering and retirement of debt). Sheffield Exhibit 3, attached Independent Auditors' Report dated June 27, 1998. The Form 10–K was executed by Ackerman and Johnson and all directors of Sheffield. *Id.*

In October or November of 1999, while Karol and Ackerman were directors of Sheffield, Sheffield disclosed to the Noteholders that it intended to pay a $2.5 million dividend, and did declare and cause Sheffield to pay a dividend to HMK in the amount of $2,293,981.28, a dividend to Ackerman in the amount of $91,715.90, and a dividend to Karol in the amount of $6,594.13. Defendants' Brief, Statement of Undisputed Facts, ¶ 25; Complaint, ¶ 12; Answer, ¶ 12.[8] The Minutes of an October 9, 1999 Board meeting, attended by Karol, Ackerman, Mr. Schaal and Mr. Stevenson, indicate that "Mr. Karol suggested that the Board should discuss and consider the payment of a special cash dividend to the Corporation's stockholders. After a discussion, upon motion duly made and seconded, the following resolutions were unanimously adopted: RESOLVED: That, effective October 29, 1999 (the 'Declaration Date'), the Corporation pay to the stockholders of the Company a special cash dividend ... in the aggregate amount of $2.5 million, or $0.7108 per share, payable on November 15, 1999 to stockholders of record at the close of business on November 10, 1999." Defendants' Exhibit 24. Ackerman states that the Board considered financial performance reports for the first quarter of fiscal year 2000 (quarter ending July 31, 1999), Sheffield's liquidity

---

8. *See also* Sheffield's Brief, Additional Facts, ¶ 49; Defendants' Reply Brief at 4, n. 11 ("Additional Facts" are "largely undisputed"); Complaint, ¶ 13; Answer, ¶ 13.

position and the receipt of "extra cash" from a litigation settlement before deciding to authorize and pay the dividend. Defendants' Brief, Statement of Undisputed Facts, ¶ 26, 27. While the reports show favorable earnings performance compared to "plan" and compared to the prior year, the reports also evidence a negative net worth. Defendants' Exhibit 20. Sheffield's Chief Financial Officer, Johnson, was never asked to prepare, and did not prepare any valuation of Sheffield's assets in connection with the payment of these dividends, and Johnson is unaware of any valuation of Sheffield's assets by the Board at the time of payment. Sheffield's Brief, Additional Facts, ¶ 51. Johnson was not requested to prepare a calculation of "surplus" as defined by Delaware law nor is he aware that the Board ever made a calculation of "surplus" at any time in connection with the dividend. *Id.*

Sheffield's audited financial statements for the fiscal year ending April 30, 1999, as reported in the Form 10–Q for the quarter ending July 31, 1999, stated assets of $152,561,000 and liabilities of $165,758,000, resulting in net equity of <$13,197,000>. Sheffield Exhibit 4 at 3.

During the quarter ending July 31, 1999, Sheffield recognized income from a litigation settlement in the amount of $2,326,000, of which $1,325,000 was paid in cash and the remaining receivable was secured by a letter of credit. *Id.* at 4 and 7. With the litigation settlement recognized at its full amount, Sheffield reported net income in that quarter of $2,785,000. *Id.* The Form 10–Q was signed by Ackerman and Johnson on September 10, 1999. *Id.* at 14.

Sheffield's unaudited balance sheet for the quarter ended October 31, 1999, as reported in the Form 10–Q, stated assets of $154,069,000 and liabilities of $167,117,000, and a net operating loss of $541,000. Sheffield Exhibit 5 at 3–4. The Form 10–Q was signed by Ackerman and Johnson on December 10, 1999. *Id.* at 15.

Sheffield's unaudited balance sheet for the quarter ended January 31, 2000, as reported in the Form 10–Q, stated assets of $154,476,000 and liabilities of $169,471,000, and a net operating loss of $1,929,000. Sheffield Exhibit 6 at 3–4. The Form 10–Q was signed by Ackerman and Johnson on March 9, 2000. *Id.* at 16.

In January and August of 1999, Ackerman exercised stock options pursuant to an Incentive Stock Option Agreement and a Non–Qualified Stock Option Agreement, both dated December 15, 1993, as amended by the Amended and Restated Incentive Stock Option Agreement and the Amended and Restated Non–Qualified Stock Option Agreement, both dated April 1, 1999 (the "Option Agreements"). Defendants' Brief, Statement of Undisputed Facts, ¶ 42, 46; Defendants' Exhibits 31, 32, 36 and 37. Generally, the Option Agreements granted Ackerman the right to purchase a certain number of shares of Sheffield at a certain price, and Sheffield had an obligation to repurchase, upon request, a particular number of those shares. *Id.* Ackerman's option rights vested in 1996. Defendants' Brief, Statement of Undisputed Facts, ¶ 42. In February, March and June of 2000, Ackerman "put" to Sheffield a total of 253,125 shares, which were repurchased by Sheffield for a sum which is in dispute.[9]

---

9. In their Statement of Undisputed Facts, Defendants fail to assert the amount paid by Sheffield for the repurchase of Ackerman's shares. Further, Ackerman disputes the purchase price stated by Sheffield in its Complaint. Complaint, ¶ 61; Answer, ¶ 61 (Ackerman admits only the dates and number of shares, but not the purchase price). For the purpose of summary judgment on Sheffield's fraudulent transfer claims, the amount of the

Ackerman claims that his contributions to Sheffield as Chief Executive Officer from 1992 to 2000, at a modest salary, should be factored into the value given to Sheffield in exchange for the stock repurchases, but such value is not quantified by Ackerman, nor can such value be determined by the Court on the record before it. Thus, the undisputed facts regarding Ackerman's years of service and contributions, while potentially material to the outcome of the litigation, are insufficient to establish as a matter of law Ackerman's defense that Sheffield received "reasonably equivalent value" in exchange for the share repurchase price it paid to Ackerman.

In June 2000, James Nolan became Sheffield's President and Chief Executive Officer, replacing Ackerman in that position, and Stephen Johnson continued as Vice President, Chief Financial Officer and Assistant Secretary. Defendants' Brief, Statement of Undisputed Facts, ¶ 37.

In Sheffield's audited financial statements for the fiscal year ending April 30, 2000, attached to Sheffield's Form 10–K, auditor KPMG reported net income of $193,000, and assets of $160,453,000 and liabilities of $179,666,000, resulting in net equity of <$19,213,000>. Sheffield Exhibit 7 at 21–22. The Form 10–K was signed by James Nolan and Johnson and all directors of Sheffield, including Ackerman, on July 19, 2000. *Id.*

The balance sheet attached to Sheffield's Form 10–Q for the quarter ending July 31, 2000 (unaudited) reported assets of $155,819,000 and liabilities of $178,977,000, for a net deficit of $23,158,000, and a net operating loss of $999,000. Sheffield Exhibit 8 at 4–5. The Form 10–Q was signed by James Nolan and Johnson on September 8, 2000. *Id.* at 13.

In Sheffield's audited financial statements for the fiscal year ending April 30, 2001, attached to Sheffield's Form 10–K, auditor KPMG reported a net loss of $24,806,000, and assets of $138,238,000 and liabilities of $187,427,000, resulting in net equity of <$49,189,000>. Sheffield Exhibit 9 at 21–22. The Form 10–K was signed by James Nolan and Johnson and all directors of Sheffield, including Ackerman. *Id.*

Until Sheffield defaulted on the Notes in 2001, Sheffield had timely paid its bills and other obligations. Defendants' Brief, Statement of Undisputed Facts, ¶ 33.

On December 7, 2001, Sheffield filed a petition under Chapter 11 of the Bankruptcy Code. Defendants' Brief, Statement of Undisputed Facts, ¶ 34. On July 26, 2002, the Court confirmed Sheffield's Second Amended and Restated Joint Plan of Reorganization (the "Plan") and reorganized Sheffield emerged from bankruptcy. Defendants' Brief, Statement of Undisputed Facts, ¶ 4. Pursuant to the Plan, the Noteholders obtained 100 percent of the issued common stock of reorganized Sheffield (subject to dilution under a management stock option plan) and the right to select four of the five new directors of Sheffield, with Mr. Nolan serving as the fifth director. Defendants' Brief, Statement of Undisputed Facts, ¶ 38; Defendants' Exhibit 28 at 12.

## VI. Conclusions of law

### A. *The Stock Repurchase Counts*

#### 1. *Reasonably equivalent value*

■ In Counts VIII and IX, Sheffield seeks to avoid as fraudulent transfers, and to recover, the purchase price paid to Ackerman for repurchasing stock on three occasions in 2000. Sheffield alleges that it

challenged transfer is a material fact, and it appears that it is in genuine dispute.

received less than a reasonably equivalent value from Ackerman in exchange for the payment of the purchase price and that Sheffield was insolvent at the time or became insolvent as a result of the stock repurchases.[10] Ackerman contends that the undisputed facts establish that he gave reasonably equivalent value.

In light of the dispute as to the value paid by Sheffield to Ackerman for the stock (see Complaint, ¶ 61, Answer, ¶ 61) [11] and Ackerman's failure to quantify the elements of value he exchanged for the stock repurchases, the record is insufficient to grant summary judgment in favor of Ackerman on Counts VIII and IX. *See Clark v. Security Pacific Business Credit, Inc. (In re Wes Dor, Inc.),* 996 F.2d 237, 243 (10th Cir.1993) (in determining whether the transferee gave "reasonably equivalent value," the court could not credit the transferee for "substantial indirect benefits" that were not quantified); *Zubrod v. Kelsey (In re Kelsey),* 270 B.R. 776, 781–82 (10th Cir. BAP 2001) (same).

### B. *Fraudulent Transfer Counts*

#### 1. *Section 117 Claims—Insolvency*

Section 117 of title 24 of the Oklahoma Statutes states, in relevant part—

> A transfer made ... by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made ... if the debtor made the transfer ... without receiving a reasonably equivalent value in exchange for the transfer ... and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer. . . .

24 O.S. § 117(A). Section 117 is identical to Section 5 of the Uniform Fraudulent Transfer Act. *See* 24 O.S.A. § 117, historical and statutory notes.

Defendants do not dispute that they received transfers of property from Sheffield on the dates alleged (Complaint, ¶¶ 10, 12, 61; Answer ¶¶ 10, 12, 61). Defendants do not concede that Sheffield received less than equivalent value for the transfers, but they do not articulate or quantify the value given to Sheffield. It is undisputed that creditors existed on the Petition Date whose claims arose prior to the payment of the challenged dividends and the repurchase of Ackerman's shares.

Defendants claim, however, that Sheffield was not insolvent at the time of, or was not rendered insolvent as a result of, the payment of dividends in December 1997, January 1998, or October or November 1999, or at the time Sheffield repurchased Ackerman's stock in February through June of 2000. In order for Defendants to obtain summary judgment by attacking Sheffield's allegation of insolvency, it must be *undisputed* that Sheffield was solvent on the date of the transfers and that the transfers did not render Sheffield insolvent.

■ The test for insolvency under the Oklahoma Uniform Fraudulent Transfer Act [12] is a "balance sheet" test identical to the test applied in analyzing insolvency under Section 548 of the Bankruptcy Code. *See Stillwater Nat'l Bank and Trust Co. v. Kirtley (In re Solomon),* 299 B.R. 626, 633, 638 (10th Cir. BAP 2003). A debtor is insolvent if its "liabilities [are] greater

---

**10.** Ackerman's request for judgment on the ground that Sheffield was not insolvent at the time of the stock repurchases is addressed in the next section of this order.

**11.** Although Ackerman denies Sheffield's allegation regarding the amount it paid to repur-

chase Ackerman's stock, he fails to state the amount he believes Sheffield did pay in Defendants' Statement of Undisputed Facts.

**12.** 24 O.S. § 112, *et seq.*

than assets at fair valuation." *Id.* at 638; 24 O.S. § 114(A) ("A debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets at a fair valuation."). Thus, in order to apply a "balance sheet" test, the Court must determine the "fair value" of Sheffield's assets and the extent of its liabilities at the time of each contested transfer.

Audited financial statements may be considered as evidence of fair value of assets and a statement of liabilities, but courts may adjust such values upon the presentation of evidence justifying such adjustments. *Solomon,* 299 B.R. at 638. Courts are split on whether the valuation of an asset must be reduced by the hypothetical costs of liquidating such assets for the benefit of creditors. *Compare Bay State Milling Co. v. Martin (In re Martin),* 145 B.R. 933, 941–42 (Bankr.N.D.Ill. 1992) (court used balance sheet as a starting point and made downward adjustments to asset values to account for (1) costs of a hypothetical sale, (2) assets that would not be available to creditors, (3) a minority discount of corporate stock owned by debtor, (4) the lack of profitability of the business in which the debtor owned stock, and (5) the artificial inflation of value of corporate assets; the court also adjusted balance sheet liabilities according to likelihood that debtor would be required to pay certain contingent debt) *to Pioneer Home Builders, Inc. v. Int'l Bank of Commerce (In re Pioneer Home Builders, Inc.),* 147 B.R. 889, 892 (Bankr.W.D.Tex.1992) (in calculating value of assets for purpose of determining insolvency, it is not appropriate to reduce the value by costs of sale;

value is what a willing buyer would pay, not what the debtor would ultimately receive from the sale of the assets, although value could be reduced by factors that might make sale difficult, such as the lack of a ready market or litigation, and value could be further adjusted if expenditures were necessary to render an asset marketable). The Tenth Circuit Bankruptcy Appellate Panel has stated, however, that fair value, however, "is determined from the creditor's perspective by examining what assets are available and the value that could be realized for payment of debts." *Solomon,* 299 B.R. at 639 n. 54, *citing Bay State Milling Co. v. Martin (In re Martin),* 145 B.R. 933, 947 (Bankr.N.D.Ill. 1992).

Defendants cite *Moody v. Security Pacific Business Credit, Inc.,* 971 F.2d 1056 (3d Cir.1992) for the proposition that "fair market value is the value on a going concern basis" and that Sheffield's balance sheets did not reflect the "going concern" value of Sheffield's assets. In *Moody,* the parties contested that court's valuation of the plant, property and equipment at "going concern value" rather than liquidation value. The court held that going concern valuation is proper "unless the business is on its deathbed." *Id.* at 1067, *quoting In re Taxman Clothing Co.,* 905 F.2d 166, 169–70 (7th Cir.1990). *See also Gillman v. Scientific Research Products, Inc. (In re Mama D'Angelo, Inc.),* 55 F.3d 552 (10th Cir.1995) (liquidation value is appropriate value for preference insolvency analysis "if at the time in question the business is so close to shutting its doors that a going concern value is unrealistic").[13] The fact

---

**13.** *See also Jones Truck Lines, Inc. v. Full Service Leasing Corp.,* 83 F.3d 253, 258 (8th Cir.1996) (balance sheet reflecting "going concern" value indicated assets exceeding liabilities, rebutting presumption of insolvency); *Wolkowitz v. American Research Corp. (In re*

*DAK Industries, Inc.),* 170 F.3d 1197, 1199 (9th Cir.1999) (in a preference case, the court stated: "The Bankruptcy Code defines insolvency, for a corporation, as a 'financial condition such that the sum of such entity's debts is greater than all of such entity's property, at

that the assets in *Moody* were valued on a "going concern" basis rather than a liquidation basis did not eliminate the requirement of performing a balance sheet test, however. *Id.* at 1066 n. 14. Evidence of each asset and each liability and their respective values is still necessary in order to determine solvency.

 The Court need not resolve the issue of whether Sheffield's "going-concern" value should be considered because the Court finds that the evidence submitted by Defendants does not establish any particular value of any particular asset at or near the time of the transfers. Defendants do not present a balance sheet that measures assets, even at "going concern" values, against liabilities to establish solvency. Instead, Defendants rely on various opinions regarding the existence of "liquidity" (which depended upon a $40 million line of credit), cash flow, earnings formulas, an optimistic preliminary "enterprise" valuation by BT Alex. Brown which admittedly depended upon "convincing potential buyers of Sheffield's EBITDA *improvement opportunities*," and an Arthur Andersen appraisal of HMK's interest in Sheffield which was prepared long after the dividends were paid. Defendants urge that their selected array of positive financial information should be accumulated to reach the conclusion that Sheffield was not insolvent at the time of any of the transfers. However, Defendants do not challenge the accuracy of Sheffield's audited financial statements or the balance sheets that were attached to S.E.C. filings bearing Ackerman's signature nor do they propose adjustments thereto based upon the "going concern" value of the assets. Defendants' Exhibit 14; Sheffield's Exhibits 1–9. The financial statements show either an excess of liabilities over assets or an inadequate equity cushion to permit payment of the transfers without causing liabilities to exceed assets. At best, Defendants' evidence is itself conflicting. *See* Defendants' Exhibits 5 (reporting only $3 million equity), 10 (showing negative net worth), 14 (showing net losses and less than $3 million in equity); 16(B) (S & P's opinion of Sheffield's limited financial flexibility, thin capitalization and "burdensome interest expense"), 20 (reflecting losses, negative net worth), 21 (negative net worth). Determining solvency or insolvency for the purpose of analyzing potential fraudulent transfers is intensely fact driven and requires an objective analysis of actual values as of the date of the challenged transfers. Mere perception of solvency by Defendants, which may have been reasonably based upon positive trends in Sheffield's production and in the industry, cannot establish solvency for the purpose of applying Section 117. *See, e.g., Official Committee of Asbestos Personal Injury Claimants v. Sealed Air Corp. (In re W.R. Grace & Co.)*, 281 B.R. 852, 857–59 (Bankr.D.Del.2002).

Thus, the record on summary judgment is inadequate to determine, as a matter of law, the issue of insolvency, and the record exposes the existence of genuine issues of material fact. Sheffield contends that the audited and unaudited financial statements accurately reflect assets and liabilities and their values; Defendants submit some evidence that the balance sheet may not properly reflect good will and other intan-

---

fair valuation...." 11 U.S.C. § 101(32). Although the Code does not define 'fair valuation,' courts have generally engaged in a two-step process of analysis. [citation omitted]. First, the court must determine whether a debtor was a 'going concern' or was 'on its deathbed.' Second, the court must value the debtor's assets, depending on the status determined in the first part of the inquiry, and apply a simple balance sheet test to determine whether the debtor was solvent.").

gible assets that comprise the value of a going concern, but do not quantify those assets in any meaningful or definitive manner. In any case, the Court may not weigh conflicting evidence of value at the summary judgment stage, and the evidence is not so one-sided as to require the Court to find that Sheffield was not insolvent as a matter of law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Therefore, Defendants' request for summary judgment on Counts I and VIII on the ground that Sheffield was not insolvent at the time of the challenged transfers is denied.

### 2. *Section 116 Claims—Unreasonably Small Remaining Assets or Incurring Debts Beyond the Ability to Pay*

■ Section 116(A)(2) of title 24 of the Oklahoma Statutes provides, in relevant part—

A transfer made ... by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made ..., if the debtor made the transfer ...:

\* \* \* \* \* \*

2. without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:

a. was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction, or

b. intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due.

24 O.S. § 116(A). Section 116 is identical to Section 4 of the Uniform Fraudulent Transfer Act. *See* 24 O.S.A. § 116, historical and statutory notes.

■ The "unreasonably small assets" provision of the Uniform Fraudulent Transfer Act has been interpreted as "a general inability to generate enough cash flow to sustain operations." *Pioneer Home Builders, Inc. v. Int'l Bank of Commerce (In re Pioneer Home Builders, Inc.)*, 147 B.R. 889, 894 (Bankr.W.D.Tex. 1992); *see also Moody v. Security Pacific Business Credit, Inc.*, 971 F.2d 1056, 1070 (3d Cir.1992). "[A] debtor's unreasonably small capital structure is presumed to lead eventually to insolvency, which is why it serves as a grounds for treating the transfer in question as fraudulent vis-a-vis other unsecured creditors." *Pioneer*, 147 B.R. at 894. "In analyzing the capital structure of a debtor, a court must examine the ability of the debtor to generate enough cash from operations and sales of assets to pay its debts and remain financially stable. [citation and quotations omitted]. A court must look to an entity's financial statements in light of the entity's need for capital during the time-frame in question." *Id.* *See also Barrett v. Continental Illinois Nat'l Bank and Trust Co.*, 882 F.2d 1, 4 (1st Cir.1989) (in assessing whether a transfer left a debtor with unreasonably small capital, court must review capital levels over a period of time both prior to and after the challenged transfer to determine the impact of the transfer on the entity's ability to sustain operations).

■ Whether the transfers in question resulted in an unreasonably small capital structure is a question of fact and on summary judgment, Defendants have the burden of establishing that there is an absence of a genuine dispute as to all material facts. Relevant to this inquiry are Sheffield's pre and post-transfer net profits and losses, cash flow, availability of credit, projections and business plans. *See Moody*, 971 F.2d at 1073. "Courts[ ] ... must weigh the raw financial data

against the nature of the entity and the extent of the entity's need for capital during the time-frame in question." *Yoder v. T.E.L. Leasing, Inc. (In re Suburban Motor Freight, Inc.)*, 124 B.R. 984, 998–99 (Bankr.S.D.Ohio 1990), *citing Barrett*, 882 F.2d at 4.

Again, the evidence regarding Sheffield's financial health over the period is mixed. Both parties have submitted evidence of profits and losses, availability of credit, industry trends and projections over the periods in question. The Court cannot weigh conflicting evidence on summary judgment and the Court must draw all reasonable inferences in favor of the non-movant, Sheffield. Again, the evidence is not so one-sided as to require the Court to find that Sheffield cannot establish that the transfers left Sheffield with unreasonably small capital as a matter of law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Accordingly, Defendants are not entitled to summary judgment on Counts II and IX.

### 3. *Recovery of the alleged transfers would "benefit the estate"*

Finally, Defendants contend that under Section 550(a) of the Bankruptcy Code, a trustee may recover a fraudulent transfer avoided under Section 544(b) of the Bankruptcy Code only to the extent that such recovery would "benefit the estate" and that "[a]t most, Sheffield's unsecured creditors are entitled to share 20 percent of any recovery proceeds less costs, fees and expenses related to pursuing the case...[and] [t]he remainder of any recovery would inure solely to Sheffield, and thus to the [Noteholders]." Defendants' Brief at 21. Defendants argue

that any recovery from Defendants should be limited to the amount that would inure to the benefit of the class of unsecured creditors that remained unsatisfied under the confirmed plan of reorganization and that "Section 544(b) [of the Bankruptcy Code] does not allow recovery where the benefit is only to the debtor." Defendants' Brief at 21.

The relevant point for assessing the existence of an avoidance action and the extent to which a transfer may be avoided is *not* the confirmation date or the date the transfer is recovered, as Defendants seem to argue, but the petition date. *See Acequia, Inc. v. Clinton (In re Acequia, Inc.)*, 34 F.3d 800, 807 (9th Cir.1994). In *Acequia*, the court held that the post-confirmation debtor who retained the right to pursue the debtor-in-possession's pre-confirmation claims could recover the full amount of a fraudulent transfer, even if all unsecured creditors had *already been paid in full* pursuant to a plan of reorganization. *Id.* at 807–08 (if a post-confirmation debtor could not recover avoided transfers after plan payment to unsecured creditors had already been made, "debtors would undoubtedly delay filing plans of reorganization until completing all potential litigation, a result that would contravene the Bankruptcy Code's goal of quick and equitable reorganization"). Thus, Defendants' argument that Sheffield's recovery is limited to only twenty percent of any avoided transfer because *the Plan* dictates that the class of general unsecured creditors would share only twenty percent of any recovery misstates the law.

The *Acequia* case also distinguished the role of the "triggering" creditor[14] in establishing the trustee's *right* to

14. The trustee's Section 544(b) power to avoid a transfer under state fraudulent trans-

fer law is derived from "stepping into the shoes" of an actual creditor who has standing

avoid the transfer from the "triggering" creditor's role (or lack of role) in establishing the *measure and extent* of the transfer the trustee is entitled to recover. *Id.* at 809. Under Section 544(b), once it is shown that on the petition date, a creditor existed who had the right to avoid a transfer under applicable state law, the trustee may recover to the extent set forth in Section 550(a) for the benefit of all creditors, regardless of the amount of the *claim* of the "triggering" creditor. *Id.* The only statutory limitation on recovery is found in Section 550(a), which provides that avoided transfers may be recovered "for the benefit of the estate." 11 U.S.C. § 550(a). Defendants argue that because only twenty percent of the recovery is earmarked for payment to unsecured creditors under the Plan, any recovery in excess of that which is payable to those unsecured creditors would not benefit the estate, but would instead benefit the debtor. The *Acequia* court rejected an identical argument, however, citing several cases that held that in instances where prepetition creditors were given an equity stake in a reorganized debtor in partial (or full) satisfaction of their prepetition claims, the increase in value of the reorganized debtor realized from the recovery of an avoidable transfer constituted a benefit to those prepetition creditors and therefore a "benefit to the estate." *Id.* at 811, *citing Trans World Airlines, Inc. v. Travellers Int'l AG (In re Trans World Airlines, Inc.)*, 163 B.R. 964, 973 (Bankr.D.Del.1994); *DuVoisin v. East Tenn. Equity, Ltd. (In re Southern Indus. Banking Corp.)*, 59 B.R. 638, 641 (Bankr. E.D.Tenn.1986) ("to the extent that plaintiff's recovery of fraudulent transfers … operates to increase the assets and financial health of the successor-in-interest [*i.e.,* the reorganized debtor], it also operates to

proportionally increase the value of those ownership rights in the successor-in-interest which constitute a portion of the unsecured creditors' distribution under the plan"). *See also Mellon Bank, N.A. v. Dick Corp.,* 351 F.3d 290, 293 (7th Cir. 2003), *cert. denied* —— U.S. ——, 124 S.Ct. 2103, 158 L.Ed.2d 723 (2004) (indirect benefit to estate was realized by promising avoidance recoveries to secured creditors to induce them to extend postpetition financing; Section 550(a)'s requirement that recovery benefit the estate is not restricted to benefits to unsecured creditors or any particular class of creditors); *Gonzales v. Nabisco Division of Kraft Foods, Inc. (In re Furrs)*, 294 B.R. 763, 773–74 (Bankr.D.N.M.2003); *Tennessee Wheel & Rubber Co. v. Captron Corp. Air Fleet (In re Tennessee Wheel & Rubber Co.)*, 64 B.R. 721, 725–26 (Bankr.M.D.Tenn.1986), *aff'd* 75 B.R. 1 (M.D.Tenn.1987).

In this case, the Noteholders traded approximately $110 million in claims for $30 million in new notes and all issued shares of Sheffield's new common stock (subject to dilution through stock options granted to new management). Defendants' Exhibit 27 at 20–21; Defendants' Exhibit 28 at 1, 12. In addition, Sheffield estimated that prepetition unsecured claims totaled $26.5 million. *Id.* Recovery of the full amount sought from Defendants—approximately $19.3 million—would not result in an impermissible benefit to the debtor, as claimed by Defendants, because to the extent the recovery is allocated to the reorganized debtor and results in an improvement in value of the reorganized debtor, Sheffield's prepetition creditors (the Noteholders) will directly reap that benefit. Allocation of eighty percent of the recov-

to avoid the transfer under the applicable state law. That creditor is sometimes referred to as the "triggering" creditor.

ery to the reorganized debtor also indirectly benefitted the estate. For instance, if the Plan had not provided that a substantial portion of the recovery would benefit the reorganized debtor (and thus the Noteholders), the Noteholders may not have consented to reducing their claim from $110 million to $30 million, and the estate (and all its constituents) would have suffered accordingly. Or the Noteholders may not have agreed that the reorganized debtor would advance the costs of the avoidance litigation (*see* Defendants' Exhibit 28 at 23, ¶ 11.04(e)), in which case the unsecured creditors would not have the potential of recovering anything. Or the Noteholders (who had priority as secured claimants) may not have agreed to allocate $1.5 million in cash to make a pro-rata distribution to general unsecured creditors in two installments within the first post-confirmation year. Thus, Defendants' contention that recovery in excess of the twenty percent allocated to unsecured creditors is precluded because such recovery would produce no benefit the estate is wholly without merit, and thus judgment cannot be entered as a matter of law in favor of Defendants on that issue.

### C. *Illegal Dividend Counts*

Under Delaware law, dividends may be paid only from the corporation's "surplus" or from its "net profits." Del Code. Ann. tit. 8, § 170. Directors are personally liable for authorizing the payment of dividends in the absence of surplus or net profits. Understanding how surplus and net profits are calculated will assist in determining whether the information the Defendants claim to have relied upon in authorizing the payment of dividends was information that could or did establish that Sheffield had sufficient surplus or net profits from which to legally pay dividends.

Section 154 of the Delaware General Corporation Law defines "surplus" as the excess of the net assets over capital. " 'Capital,' as used here, is generally the sum of the aggregate par value of all issued shares with par value and at least some part of the consideration received for all issued shares without par value." BARBARA BLACK, CORPORATE DIVIDENDS AND STOCK REPURCHASES § 2:23 (2003 ed.). "Net assets means the amount by which total assets exceed total liabilities. Capital and surplus are not liabilities for this purpose." Del.Code Ann. tit. 8, § 154.

The reason dividends are payable only out of surplus or net profits is "to prevent boards from draining corporations of assets to the detriment of creditors and the long-term health of the corporation." *Klang v. Smith's Food & Drug Centers, Inc.*, 702 A.2d 150, 154 (Del.1997). "There are few, if any, doctrines more firmly rooted in our jurisprudence than that the capital stock of a corporation is a trust fund for the payment of the corporate indebtedness before any distribution among the shareholders." *Official Committee of Unsecured Creditors v. Reliance Capital Group, Inc. (In re Buckhead America Corp.)*, 178 B.R. 956, 972 (D.Del.1994), *quoting Hamor v. Taylor–Rice Engineering Co.*, 84 F. 392, 395 (C.C.D.Del.1897). "Statutes protecting the integrity of a corporation's stated capital aim at 'protecting those who have extended credit to a corporation and who have relied on stated capital as a trust fund for the security of creditors.... The purpose of section 174 ... is to provide a cause of action to creditors who have extended credit to a corporation based on that corporation's stated capital. And when the corporation impairs that capital ..., it depletes the creditors' 'trust fund' and seriously jeopardizes their means to recover their

debts." *Id.* at 972, *quoting Johnston v. Wolf,* 487 A.2d 1132, 1134–35 (Del.1985).

■ In assessing the health of a corporation prior to declaring dividends, directors are not limited to assessing assets and liabilities reflected on the balance sheet in calculating the availability of surplus. Under Delaware jurisprudence, the board may revalue assets and liabilities to include unrealized appreciation when determining whether net assets exceed the capital "trust fund" reserved for creditors. For example, in *Klang,* the Delaware Supreme Court, sitting *en banc,* concluded that—

> [b]alance sheets are not ... conclusive indicators of surplus or a lack thereof. Corporations may revalue assets to show surplus, but perfection in that process is not required. Directors have reasonable latitude to depart from the balance sheet to calculate surplus, so long as they evaluate assets and liabilities in good faith, on the basis of acceptable data, by methods that they reasonably believe reflect present values, and arrive at a determination of the surplus that is not so far off the mark as to constitute actual or constructive fraud.

*Klang,* 702 A.2d at 152.

The Court in *Klang* interpreted "surplus" in the context of determining whether directors violated Section 160(a) of the Delaware General Corporation Law, the statute applicable to repurchasing shares of a corporation. Section 160 prohibits a corporation from repurchasing or redeeming its own shares "for cash or other property when the capital of the corporation is impaired or when such purchase or redemption would *cause any impairment of the capital* of the corporation." Del.Code Ann. tit. 8, § 160(a)(1) (emphasis added). The statute limiting the declaration of dividends, Section 170, states that dividends may be declared "(1) out of its *surplus, as*

defined in and computed in accordance with §§ 154 and 244 of this title, or (2) in case there shall be no such surplus, out of its net profits for the fiscal year in which the dividend is declared and/or the preceding fiscal year." Del.Code Ann. tit. 8, § 170(a)(1) (emphasis added). Whether the directors' prerogative to revalue assets for the purpose of avoiding an "impairment of capital" under Section 160 applies with equal force when determining "surplus" for the purpose of complying with Section 170 was not decided by *Klang.*

In *Morris v. Standard Gas & Electric Co.,* 63 A.2d 577 (Del.Ch.1949), however, the Delaware Court of Chancery did evaluate the sufficiency of the efforts made by directors to determine whether a surplus existed before declaring a dividend. Noting that the statute requiring dividends to be paid from surplus did not impose any particular method of valuing assets and liabilities, and finding that obtaining a formal appraisal of each corporate asset prior to every declaration of a dividend was impractical and that in any event, there was no one appraisal method that would produce a truly "objective" or definitive value, the court concluded that the directors had acted reasonably in seeking and relying upon the opinions of numerous competent professionals regarding the existence of a surplus. *Id.* at 581–82.

In rejecting the requirement that a *formal* appraisal of assets be obtained, the court stated—

> If by an appraisal plaintiff means that all the assets had to be viewed and evaluated separately by the directors or experts ..., I conclude that the statute imposes no such requirement on the directors.... In large companies, ... an appraisal of the type suggested by plaintiff would mean that as a practical matter the provisions of Section 34(b) [permitting declaration and payment of

dividends] would be unavailable. [Citations omitted]. I prefer the view expressed in the following language of the New York Supreme Court in *Randall v. Bailey*, ... 288 N.Y. 280, 43 N.E.2d 43:

I see no cause for alarm over the fact that this view [taking assets at actual value] requires directors to make a determination of the value of assets at each dividend declaration. On the contrary, I think that is exactly what the law always has contemplated that directors should do. That does not mean that the books themselves necessarily must be altered by write-ups or write-downs at each dividend period, or that formal appraisals must be obtained from professional appraisers or even made by the directors themselves. That is obviously impossible in the case of corporations of any considerable size.

In concluding that a formal appraisal of the type mentioned is not required, I do not mean to imply that the directors are not under a duty to evaluate the assets on the basis of acceptable data and by standards which they are entitled to believe reasonably reflect present "values." It is not practical to attempt to lay down a rigid rule as to what constitutes prior evidence of value for the consideration of directors in declaring a dividend under Section 34(b). The factors considered and the emphasis given will depend upon the case presented.

*Id.* at 582. The specific facts in *Morris* that convinced the court that the directors adequately investigated the financial position of the corporation (a utility holding company) and reasonably determined that a surplus existed from which dividends could be paid are as follows:

- The board reviewed the requirements of the statute requiring that dividends be paid from surplus. In order to evidence the existence of surplus, the board requested an independent competent appraiser familiar with the corporation's assets to prepare an appraisal of assets (consisting of utility stocks) to determine whether "in its judgment" the assets less the liabilities exceeded the amount needed to pay the proposed dividends. The report, which was presented to the board for the express purpose of considering a declaration of dividends, concluded, in general terms, that the net assets of the corporation exceeded the paid in capital and the proposed dividend. *Id.* at 579.

- The vice president and treasurer of the company, found to be "complete[ly] familiar" with the assets of the corporation and "eminently qualified both in education and experience to make ... a valuation," reported to the board that the net assets "substantially exceeded" the amount needed to lawfully declare the proposed dividend. *Id.* at 580.

- The board obtained opinions from "two Delaware attorneys and one Chicago attorney as to whether a dividend might legally be declared under the Delaware statute." *Id.*

- The balance sheet showed "earned surplus" of over $25 million, many times the amount of the proposed dividend, but the directors, in an abundance of caution, sought permission from the S.E.C. to pay dividends, which permission was required to pay dividends from unearned surplus or capital in the event that it might be argued that the balance sheet "earned surplus" was not accurate or was insufficient to fully cover the dividend. Without making a determination as

to the amount of surplus, the S.E.C. granted permission to pay the dividend. *Id.* at 579–80.

- The board met three times to consider the legality before declaring and paying the dividend. *Id.* at 582.

- The valuation analysis of the party attacking the dividend contained mathematical errors, made improper deductions from value and used questionable and arbitrary formulas for determining value. *Id.* at 584.

■ As in *Morris,* Sheffield's allegation of director liability for improper declaration and payment of dividends boils down to a dispute as to the appropriate method of determining net assets available for payment of such dividends and whether the board exercised sufficient care, diligence and reason in attempting to conform to the law limiting the payment of dividends from surplus.

Section 172 of the Delaware General Corporation Law codifies the duty of care, diligence, good faith and reason expressed in *Morris,* and immunizes directors from liability for declaring an otherwise illegal dividend under certain circumstances. Section 172 provides—

A member of the board of directors, or a member of any committee designated by the board of directors, shall be fully protected in relying in good faith upon the records of the corporation and upon such information, opinions, reports or statements presented to the corporation by any of its officers or employees, or committees of the board of directors, or by any other person as to matters the director reasonably believes are within such other person's professional or expert competence and who has been selected with reasonable care by or on behalf of the corporation, as to the value and amount of the assets, liabilities and/or net profits of the corporation or

any other facts pertinent to the existence and amount of surplus or other funds from which dividends might properly be declared and paid, or with which the corporation's stock might properly be purchased or redeemed.

Del.Code Ann. tit. 8, § 172. In order to prevail on summary judgment under the safe harbor affirmative defense provided by Section 172, Defendants must submit undisputed evidence of each element of the defense. *See Paul v. Monts,* 906 F.2d 1468, 1474 (10th Cir.1990). In addition, Karol and Ackerman must show that the officer or expert upon whom they relied actually determined the existence of a surplus prior to the authorization of the dividend and that it was reasonable to rely on that officer or expert. *See Pereira v. Cogan,* 294 B.R. 449, 540 (S.D.N.Y.2003) (applying Delaware law).

Defendants submit the narrative of Ackerman and Stevenson to evidence the material considered by the Board in connection with the declaration and payment of dividends. The record fails to establish that the Board acted with care in selecting experts or professionals to determine, *prior to* declaring the dividends, that a surplus existed from which dividends could be lawfully paid. There is no corporate resolution, minute or other document in the record indicating that the Board made a calculation of surplus before declaring dividends. The audited financial statements indicated an absence of surplus. Although Ackerman contends he relied upon legal advice that the Offering did not violate any laws, the Board was not entitled to rely upon the Mintz Opinion, which was prepared for the initial purchaser of the Notes and the indenture trustee, neither of whom had a stake in insuring that the proposed dividends were legal and unimpeachable. The Board could not have relied upon the BT Alex. Brown speculative "preliminary

valuation" to justify the payment of the $10 million dividend because it was not issued until after the dividend was paid. In addition, the context of the BT Alex. Brown valuation, *i.e.*, appearing in a solicitation by an investment bank for business, and the caveats stated therein, *i.e.*, that the proposed value of Sheffield as an enterprise depended upon convincing a purchaser that earnings would improve, undermine the credibility of the valuation and the Board's right to rely on BT Alex. Brown's opinion. Ackerman and Stevenson also assert that they considered the raw earnings data compiled from Sheffield's accounting records, and while such data may be relevant, the conclusions derived therefrom by Ackerman and Stevenson, apparently in hindsight, do not establish that the Board considered this data in assessing the availability of surplus prior to approving the dividends or that the conclusions that Ackerman and Stevenson have drawn are inherently reasonable. In addition, the Court could infer, in favor of Sheffield, that failing to consult Sheffield's Chief Financial Officer regarding the existence of surplus was unreasonable. For these and other reasons, the Court cannot conclude, as a matter of law, that Karol and Ackerman qualify for protection from liability for payment of unlawful dividends under the Delaware's safe harbor provision.

 Further, genuine issues of material fact exist in connection with the existence of surplus, and thus the Court cannot determine as a matter of law that the dividends were in fact legally paid. Summary judgment cannot therefore be entered on Count III (Improper Dividend—Directors) or Count VII (Breach of Fiduciary Duty by Directors, which is derivative of Count III). The Court further notes that the safe harbor provided by Section 172, available to directors, is not available to *the recipients* of unlawful dividends. Accordingly, Defendants fail to establish they are entitled to judgment as a matter of law on Count IV (Improper Dividend—Shareholders).

### D. Defendants' Estoppel Defense

### 1. Defendants fail to establish identity of entities allegedly estopped

 Defendants argue that the disclosure of Sheffield's intent to pay dividends from the proceeds of the Offering and the disclosure of extensive financial data in connection with the Offering estop Sheffield, which is currently owned by former Noteholders, from challenging the payment of dividends as fraudulent transfers, as violations of Section 170 of the Delaware General Corporation Laws, or as a breach of the directors' fiduciary duty to the corporation. To establish their estoppel defense, Defendants first argue that because Sheffield is currently owned by former Noteholders, Sheffield is bound by whatever defenses Defendants could assert if the Noteholders themselves were seeking the recovery of fraudulent transfers or unlawful dividends. The Court notes an absence of evidence in the record to establish that the current shareholders of Sheffield are the same entities that initially purchased the Notes, however. Moreover, with respect to the illegal dividend and breach of fiduciary duty claims, Sheffield is seeking to vindicate its rights as a corporation, an entity distinct from its shareholders.[15]

---

15. Defendants state, without pointing to any authority for the statement, that "equity will not allow Sheffield to hide behind its debtor status to enrich improperly its current own-ers." Defendants' Brief at 20. In order for Sheffield, a corporation, to be bound or estopped by the acts of prospective Noteholders who later became Sheffield's shareholders,

With respect to the fraudulent transfer counts, Defendants argue that because Sheffield is invoking Section 544(b) of the Bankruptcy Code to use state law (OUFTA) as a means of avoiding the transfers, Sheffield must step into the shoes of an actual creditor who would be entitled to pursue such an avoidance, and therefore all defenses Defendants have against such creditor are imputed to Sheffield. Section 544(b) states in relevant part that "the trustee may avoid any transfer of an interest of the debtor in property ... that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title or that is not allowable only under section 502(e) of this title." 11 U.S.C. § 544(b)(1). The general rule is that the trustee obtains no greater rights than the unsecured creditor who was entitled to pursue the avoidance of a transfer. *See, e.g., Harris v. Huff (In re Huff)*, 160 B.R. 256, 261 (Bankr.M.D.Ga.1993); *Brent Explorations, Inc. v. Karst Enterprises, Inc. (In re Brent Explorations, Inc.)*, 31 B.R. 745, 748 (Bankr.D.Colo.1983). Thus, Defendants argue, Sheffield cannot prevail if Defendants establish that the actual creditor whose rights Sheffield is asserting would be estopped from recovering under OUFTA.

Sheffield contests the legal sufficiency of estoppel as a defense to claims seeking the avoidance of fraudulent transfer. Specifically, Sheffield claims that "there is no legal authority to support a claim that estoppel would avoid the recovery of" the dividends. Sheffield's Brief at 31. However, Section 122 of title 24 of the Oklahoma Statutes provides—

Unless displaced by the provisions of the [Oklahoma] Uniform Fraudulent Transfer Act, the principles of law and equity, including the law merchant and the law relating to principal and agent, *estoppel,* laches, fraud, misrepresentation, duress, coercion, mistake, insolvency, or other validating or invalidating cause, supplement the provisions of the [Oklahoma] Uniform Fraudulent Transfer Act.

24 O.S. § 122 (emphasis added). Sheffield contends that notwithstanding the express adoption of equitable principles as supplemental to the statutory law governing fraudulent transfers, Section 122 was intended to "enhance the scope of the OUFTA and not limit it" and thus may not be invoked defensively to preclude a plaintiff from avoiding and recovering an alleged fraudulent transfer. Sheffield Brief at 31. Sheffield cites two cases in support of its contention: *Mejia v. Reed,* 31 Cal.4th 657, 3 Cal.Rptr.3d 390, 74 P.3d 166 (2003) and *Volk Const. Co. v. Wilmescherr Drusch Roofing Co.,* 58 S.W.3d 897 (Mo.Ct.App. 2001). While those cases could be interpreted to suggest that the supplementary principles may not be used defensively to defeat a claim under the UFTA because they conflict with the provisions of the UFTA, this Court respectfully disagrees. Section 122, which is identical to the uniform law, was modeled after Section 1–103 of the Uniform Commercial Code. *See* Comment to Unif. Fraudulent Transfer Act § 10. Oklahoma courts recognize estoppel as a defense to claims arising under the Uniform Commercial Code. *See, e.g., W.R. Grimshaw Co. v. First Nat'l Bank and Trust Co.,* 1977 OK 28, 563 P.2d 117; *Central Nat'l Bank & Trust Co. v. Community Bank & Trust Co.,* 1974 OK 141, 528 P.2d 710, 713. No provision in the

however, the corporate form must be disregarded. Defendants have not alleged or established any grounds for a "reverse" piercing of the corporate veil—that is, treating acts of individual shareholders as the acts of the corporation—nor have Defendants established that Sheffield is an alter ego of its current shareholders.

OUFTA expressly "displaces" or negates the use of estoppel as a defense, and therefore the Court concludes that estoppel may be invoked as a defense to fraudulent transfer avoidance claims in appropriate cases. *See also Reitmeyer v. Meinen (In re Meinen)*, 232 B.R. 827, 844 (Bankr. W.D.Pa.1999) ("the defenses of equitable estoppel, laches, and waiver are preserved under the Pa. UFTA ... and in appropriate instances, may be used to shorten the pertinent limitations period").

Thus, Defendants are entitled to assert estoppel as a defense if they can establish that the only creditor or creditors from whom Sheffield's claim is derived are estopped. Defendants do not argue that no actual creditors existed on the petition date who possessed rights to avoid the transfers; it is undisputed that such creditors exist. Instead, they assume that the *only* creditors possessing the power to avoid the transfers on the petition date were the Noteholders, and that the Noteholders are estopped from pursuing an avoidance claim because they purchased the Notes with knowledge of the planned dividends. The record does not establish that the Noteholders are the only qualified creditors from whom Sheffield derives its rights under Section 544(b), however.

### 2. Defendants' evidence does not establish that the Noteholders are estopped

Even if the record contained evidence that the Noteholders are the only "triggering" creditors under Section 544(b) and that the Noteholders existing on the petition date were the same entities as the Noteholders who purchased Notes pursuant to the Offering, the Court concludes that the evidence presented by Defendants in support of their estoppel argument does not establish estoppel as a matter of law.

Courts articulate the elements of estoppel in a variety of ways. The Tenth Circuit Court of Appeals has stated that—

> Historically, equitable estoppel has been used to prevent a party from taking a legal position inconsistent with an earlier statement or action that places his adversary at a disadvantage. *See* W. Keeton, D. Dobbs, R. Keeton & D. Owen, Prosser and Keeton on the Law of Torts § 05, at 733 (5th ed.1984). The purpose of the doctrine of equitable estoppel is to ensure that no one will be permitted to "take advantage of his own wrong." *R.H. Stearns Co. v. United States*, 291 U.S. 54, 62, 54 S.Ct. 325, 328, 78 L.Ed. 647 (1934). In private suits, the traditional elements of equitable estoppel are: (1) the party to be estopped must know the facts; (2) the party to be estopped must intend that his conduct will be acted upon or must so act that the party asserting the estoppel has the right to believe that it was so intended; (3) the party asserting the estoppel must be ignorant of the true facts; and (4) the party asserting the estoppel must rely on the other party's conduct to his injury. *Che–Li Shen v. INS*, 749 F.2d 1469, 1473 (10th Cir.1984).

*Penny v. Giuffrida*, 897 F.2d 1543, 1545–46 (10th Cir.1990). Oklahoma courts recognize that estoppel is an amorphous concept that defies easy definition. *See, e.g., Apex Siding and Roofing Co. v. First Federal Savings and Loan Ass'n*, 1956 OK 195, 301 P.2d 352, 355 ("any attempted definition [of estoppel] usually amounts to no more than a declaration of estoppel under those facts and circumstances"). In order to invoke the defense of estoppel, a defendant must establish that the plaintiff affirmatively took a position on an issue upon which the defendant relied, in good faith, and changed its position to its detriment. "It holds a person to a representation made, or a position assumed, where

otherwise inequitable consequences would result to another, who, having a right to do so under the circumstances, has in good faith relied thereon." *Apex*, 301 P.2d at 355.

Defendants assert that because the original Noteholders were apprised that $10 million of the $110 million proceeds of the Offering would be used to pay dividends and that an unspecified $2.5 million payment was excepted from certain restrictions otherwise placed on Sheffield's expenditures during the term of the Notes, and because the original Noteholders were provided with the same financial information that Sheffield now presents as evidence that Sheffield was insolvent (or lacked surplus) when the dividends were announced, the Noteholders "expressly approved" the payment of dividends by purchasing the Notes without objecting to the proposed payment of the dividends, presumably with knowledge that Sheffield was insolvent or without surplus. Although it is undisputed that Sheffield disclosed its intention to pay a $10 million dividend with the proceeds of the Offering and that historical financial information was presented, Defendants present no evidence of an "express approval," or any representation whatsoever, by Noteholders that could be construed to acquiesce in alleged fraudulent transfers, violations of the surplus statute, or breaches of fiduciary duty by directors. The most that can be said is that the Noteholders purchased Notes knowing that a $10 million dividend would be paid from the proceeds.[16] Presumably if the Notes had not been purchased, the dividend would not have been paid because Sheffield would not have had the cash to pay the dividend. But it does not logically follow that because the Noteholders did purchase Notes, they agreed that the directors could dispense with the legal requirements imposed upon them in declaring and causing the payment of dividends. There is no evidence that the Noteholders "took a position" with respect to the legality of the proposed dividend that they now refute or that they intended to mislead the directors into paying dividends in the absence of surplus or in the face of insolvency. Accordingly, the mere purchase of Notes did not result in an "express approval" upon which the directors could rely in declaring dividends notwithstanding the requirements of Delaware law or the financial status of the corporation.

■ Nor did the prospective Noteholders have a duty or obligation, as directors do, to (1) assess the legality of the dividend at the time it is to be paid[17] or (2) advise

---

**16.** The fact that Sheffield intended to pay a further $2.5 million *dividend* was not specifically disclosed. Rather, in the Offering Sheffield reserved the right to make a non-specific $2.5 million payment free of *restrictions imposed by the Offering*. The Offering does not state or suggest that the payment could be made free of restrictions otherwise imposed by law.

**17.** As Defendants themselves point out, the raw data contained in the financial statements summarized in the Offering is not definitive as to the measurement of surplus or solvency. Defendants fail to explain why prospective Noteholders should be expected to have performed the directors' duty of evaluat-

ing the fair value of the assets and debts of Sheffield for the purpose of determining surplus under Delaware law or solvency under the laws of fraudulent transfers in connection with declaring or paying the dividends. The party sought to be estopped "must know the facts" and the party seeking estoppel must have been ignorant of the facts. *Giuffrida*, 897 F.2d at 1545–46. Neither of these elements are shown with indisputable evidence here.

Moreover, Oklahoma courts generally "refuse to give effect to an estoppel where the parties were equally well informed as to the essential facts or where the means of knowledge were equally open to them." *Hillers v. Local Fed. Sav. & Loan Ass'n*, 1951 OK 57,

the directors of their concerns even if they did have some concerns about the legality of the dividend. In the absence of a positive duty to speak, silence will not create conditions justifying estoppel. *See Harris Tourist Bed Co. v. Whitbeck,* 1930 OK 555, 294 P. 800, 803; *Ash v. Mickleson,* 1926 OK 298, 247 P. 680. Karol and Ackerman argue that they "approved the Offering and the dividends in reliance upon the Bondholders' willingness to loan the Company $110 million through their purchase of the Bonds in light of the disclosures made" and all Defendants contend that they "relied upon the Bondholders' approval of the Dividends ... in accepting their pro rata share of the dividends." Defendants' Brief at 19–20. The directors, being fiduciaries, had no right to rely on the silence of potential Noteholders, who had no obligation (or right) to oversee the directors or insure that they fulfilled their duties to the corporation.

Accordingly, Defendants are not entitled to summary judgment on their estoppel defense on Counts I, II, III, IV and VII.

## VII. Conclusion

For the reasons stated above, the Motion is denied in all respects.

232 P.2d 626, 630. Thus, a party "who claims the benefits of an equitable estoppel on the ground that he has been misled through the conduct of another must not have been misled through his own want of reasonable care." *Id. See also Spaulding v. United Transp. Union,* 279 F.3d 901, 909 (10th Cir. 2002) (reliance "must have been reasonable in that the party claiming the estoppel did not know nor should it have known that its adversary's conduct was misleading" (quotation and citation omitted)).

In this case, it is Defendants who had, or should have had, superior knowledge regarding the existence of surplus and solvency, and therefore cannot be heard to claim they were misled into believing that the dividends were legal and beyond recovery by the prospective Noteholders' failure to object to the proposed payment contained in the Offering.